UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YUITZA PAGAN, | : | No. 1:23-CV-1502 |
| | : | |
| Plaintiff | : | (Caraballo, M.J.) |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO,[1] | : | |
| Commissioner of Social | : | |
| Security, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

## I.    Introduction

Plaintiff Yuitza Pagan seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability benefits and supplement security income benefits under Titles II & XVI of the Social Security Act. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This matter comes before the Court on Pagan's claims that Administrative Law Judge ("ALJ") Randy Riley erred when he: (1) determined her residual functional capacity ("RFC"); (2) failed to find

---

[1] Frank Bisignano was confirmed as the Commissioner of the Social Security Administration on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Frank Bisignano is substituted for Kilolo Kijakazi as the defendant in this suit.

several of Pagan's limitations and health issues severe; and (3) found opinion evidence from state agency consultants more persuasive than those of Pagan's treating physicians. Doc. 9 at 2, 13–15, 21–22, 27. The matter is fully briefed and ripe for decision.

As explained below, the ALJ's conclusions when addressing all three challenged issues were supported by substantial evidence in the record, coupled with sufficient reasoning to permit meaningful judicial review. Accordingly, the Court will affirm the Commissioner's decision to deny Pagan's claim for social security disability benefits and supplement security income benefits.

## II.    <u>Background</u>

On March 10, 2021, Pagan applied for Title II social security disability benefits and Title XVI supplement security income benefits, alleging complete disability from a myriad of impairments, including mental health disorders, mini-strokes, migraines, a hernia, and vitamin D deficiency. Doc. 16 at 184, 191 (hereinafter referred to as "Tr."). The Social Security Administration initially denied Pagan's application in July 2021, and upon reconsideration in November 2021. Tr. 184, 191,

205, 213. Pagan thereafter requested a hearing before an ALJ. *Id.* at 219.

On October 20, 2022, ALJ Riley presided over Pagan's hearing. The hearing concerned whether Pagan was disabled within the meaning of the Social Security Act since August 7, 2019. *Id.* at 43, 60. At the hearing, ALJ Riley received various evidence of record, including clinical records, medical history, medical expert reports, vocational expert testimony, and Pagan's own testimony. *Id.* at 43–68.

On October 28, 2022, ALJ Riley issued a decision concluding that Pagan was not disabled from August 7, 2019, to the date of the decision. *Id.* at 15–17. ALJ Riley reached that conclusion by employing the five-step analytical process required under the Social Security Act to evaluate disability insurance and supplement security income claims. *See* 20 C.F.R. § 404.1520(a)(4).

The process requires sequential consideration of: (1) whether the claimant is engaged in substantial gainful work activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment meets or equals a defined list of impairments; (4) a comparison between the claimant's past relevant work and residual functional capacity, *i.e.,*

3

the most work that a claimant can perform despite his or her
limitations on a regular and continuing basis, *see* 20 C.F.R.
§ 404.1545(a); and (5) an assessment of the claimant's residual
functional capacity and his or her age, education, and work experience.
20 C.F.R. § 404.1520(a)(4)(i)–(v). Should a claimant proceed past the
first three steps of the analysis, the Commissioner will not find the
claimant disabled when he or she can perform past relevant work, or
adjust to other work, under the third and fourth steps, respectively. *Id.*
at § 404.1520(a)(4)(iv)–(v), (f), (g).

Applying that analysis, ALJ Riley first determined that Pagan
met the insurance requirements of the Social Security Act, *see* 20 C.F.R.
§ 404.130, through June 30, 2020. Tr. 20. ALJ Riley also found that
Pagan had not engaged in substantial gainful activity between August
10, 2020, through the date of the decision. *Id.*

At the second step of the analysis, ALJ Riley found that Pagan
suffered from ten severe impairments: osteoarthritis of the bilateral
knees, obesity, obstructive sleep apnea, asthma, status post
cerebrovascular assault, migraine headaches, bipolar disorder,
depressive disorder/persistent mood disorder, anxiety disorder, and

insomnia. *Id.* at 21. ALJ Riley also identified several non-severe impairments, including umbilical hernia, ankle sprain, dysmenorrhea, hypertension, and gastroesophageal reflux disease. *Id.* He found that Pagan either suffered from these latter impairments for an insufficient duration, *i.e.* less than a year, or the impairment failed to cause "significant or ongoing symptoms . . . during the relevant period" and that the evidence did not otherwise "establish that [it] . . . caused more than a minimal restriction on the claimant's ability to perform basic work activities." *Id.*

Moving to the third step of the analysis, ALJ Riley determined that Pagan's severe impairments failed to meet or medically equal one of the impairments listed in the Social Security Administration's regulations. *Id.* at 22. Pagan thus did not automatically qualify as disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

Accordingly, ALJ Riley proceeded to determine Pagan's residual functional capacity, before addressing the final two steps in the

sequential analysis. Based on the medical evidence of record, ALJ Riley concluded that Pagan could perform light work, subject to additional limitations:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she may occasionally balance, stoop, crouch, and climb ramps or stairs, but must never kneel, crawl, or climb ladders, ropes, or scaffolds. The claimant must avoid exposure to extreme cold, vibrations, pulmonary irritants, excessive noise (SCO level of 3), and hazards such as heights and machinery. The claimant can understand and carry out simple, routine, repetitive tasks involving only simple work related decisions with few, if any, workplace changes. The claimant can sustain attention for extended periods of two hour segments while maintaining regular attendance and being punctual within customary allowances, in an environment free of fast paced production activity. The claimant must never interact with the public.

Tr. 25.

In reaching that conclusion, ALJ Riley analyzed three areas germane to this opinion. First, ALJ Riley considered Pagan's statements regarding her impairment symptoms:

> The claimant asserts her conditions limit her ability to work. She asserts her conditions limit her ability to care for her personal care needs and prepare meals, and impact her ability to sleep (Exhibit C9E). She also asserts that her conditions limit her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks (Exhibit C9E). With regard to the claimant's mental health conditions, she indicates her conditions limit her ability to understand and

6

> remember things, follow both written and spoken
> instructions, concentrate, and get along with others (Exhibit
> C9E). She also asserts that she has difficulty handling stress
> and changes in routine (Exhibit C9E). The claimant notes that
> she takes medication to treat her conditions, which cause side
> effects of drowsiness (Exhibit C9E).

*Id.* at 25. ALJ Riley did not, however, find that testimony

convincing, stating:

> After careful consideration of the evidence, the undersigned
> finds that the claimant's medically determinable impairments
> could reasonably be expected to cause the alleged symptoms;
> however, the claimant's statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> entirely consistent with the medical evidence and other
> evidence in the record for the reasons explained in this
> decision.

*Id.* at 25–26.

Second, ALJ Riley surveyed the clinical evidence of record

regarding Pagan's impairments and ultimately compared it to her

alleged symptoms, to explain his basis for deeming them inconsistent

with one another. First, he evaluated several of her physical ailments:

> The record establishes the claimant is status post
> cerebrovascular assault. The claimant experienced a stroke
> prior to the relevant period that was remote in nature
> (Exhibit C22F at 3). During the relevant period, she obtained
> follow up care in the form of oral medication for stroke
> prevention (Exhibit C1F at 3). The claimant reported memory
> issues associated with her stroke (Exhibit C20F at 47).
> Treatment records from June 2020 note the claimant reported

7

chronic disability due to residual effects related to her condition (Exhibit C4F at 25). At the time, her physical examination revealed normal coordination, a normal range of motion, and normal strength (Exhibit C4F at 25). Thereafter, treatment records from August 2021 note the claimant reported experiencing speech difficulty that presented with drooling and difficulty with ambulation related to her stroke history (Exhibit C17F at 9). On examination, she had a normal neurologic examination, with no difficulty upon gait testing (Exhibit C17F at 9). Her treatment provider also noted the claimant exhibited normal speech (Exhibit C17F at 9). However, given her subjective reports of symptoms, the claimant was referred to physical therapy (Exhibit C17F at 9). Notably, additional records from later in August 2021 note the claimant reported that her speech difficulty resolved 24 hours later (Exhibit C8F at 4). She also reported improved gait, but indicated she continued to walk into objects (Exhibit C8F at 4). Thereafter, treatment records from March 2022 note that the claimant reported residual cognitive and mental health limitations, but no residual physical deficits associated with her stroke (Exhibit C19F at 260). . . .

The record establishes the claimant has a history of osteoarthritis of the bilateral knees. Treatment records note the claimant also had a history of obesity. In December 2019, the claimant reported experiencing weight gain as a side effect to one of her medications (Exhibit C20F at 59). In June 2021, the claimant underwent a consultative examination (Exhibit C6F). During the evaluation, the claimant did not report bilateral knee pain, but had findings of a squat that was 50% of full (Exhibit C6F at 3-4). The claimant's limited squat was attributed to her weight (Exhibit C6F at 4). The examination also revealed a normal gait, but difficulty walking on her heels and toes (Exhibit C6F at 5). In addition, she maintained five out of five lower extremity strength despite some limitations (Exhibit C6F at 6). Thereafter, treatment records from July 2021 note that the claimant presented to a treatment visit and reported left knee pain

(Exhibit C19F at 197). At the time, the claimant exhibited edema and reported pain (Exhibit C19F at 200). During a subsequent visit in September 2021, the claimant reported right knee pain (Exhibit C10F at 6). Her treatment provider attributed the symptoms to osteoarthritis in her weight-bearing joints due to her high body mass index (Exhibit C10F at 6). At the time, conserbative [sic] treatment in the form of topical medications, heat, and aqua therapy was recommended as necessary (Exhibit C10F at 6). Additional records note the claimant did not report any knee conditions during a functional capacity evaluation June 2022 (Exhibit C22F at 3). The claimant maintained a normal gait pattern at the evaluation (Exhibit C22F). At the time, the claimant's height was 5 feet 3 inches and she weighed 261 pounds (Exhibit C22F at 2). Given the claimant's height and weight, her body mass index was a 46.2, which is indicative of morbid obesity.

*Id.* at 26–27. Second, ALJ Riley addressed Pagan's reoccurring migraine headaches:

The record establishes the claimant has a history of migraine headaches. Treatment records from October 2019 note the claimant reported migraines nearly everyday (Exhibit C20F at 54). Thereafter, treatment records from April 2020 note the claimant reported frequent headaches of up to 15 to 20 days per month that presented with light and noise disturbances (Exhibit C1F at 3). As such, the claimant was prescribed medication to help manage her condition (Exhibit C1F at 3). Treatment records from June 2020 note the claimant's condition was stable (Exhibit C4F at 25). Thereafter, treatment records from May 2021 continued to note that her medication was helping her migraines and reduced frequency to three or four times per month (Exhibit C17F at 17). Additional records from December 2021 note that the claimant reported migraines relatively well controlled on her medication regimen, with a frequency of one to two headaches

9

per month (Exhibit C17F at 6). . . . In May 2022, the claimant reported an increase in migraine headaches; however, the record indicates the claimant never started her medication regimen that had been approved since December 2021 (Exhibit C25F at 7). At the time, she admitted to never picking up the medication and deferred additional preventatives (Exhibit C25F at 7).

*Id.* at 27. Third, the ALJ reviewed Pagan's various mental health maladies:

The record establishes the claimant has a history of anxiety disorder, depressive disorder, and insomnia. The claimant was treated for the conditions prior to the relevant period and continued to receive treatment after the amended alleged onset date (Exhibit C5F at 9). Treatment records from August 2019 note the claimant reported chronic insomnia (Exhibit C20F at 47). At the time, she also reported intermittent irritability, mood fluctuations, and auditory hallucinations (Exhibit C20F at 47). On examination, the claimant was oriented to person, place, and time with a linear thought process and appropriate thought content (Exhibit C20F at 49). Treatment records from the time also note the claimant maintained intact cognition and fair attention, judgment, and insight (Exhibit C20F at 49). As a result of her reported symptoms, the claimant received medication management (Exhibit C20F at 50). However, in October 2019, the claimant reported that her medication was not managing her sleep (Exhibit C20F at 54). As a result, her medication regimen was increased (Exhibit C20F at 55). Thereafter, treatment records from December 2019 note the claimant reported the increased helped to improve her sleep and mood (Exhibit C20F at 59). The claimant continued to report intermittent symptoms of insomnia in 2020 (Exhibit C1F at 6; C20F at 149). In October 2020, she also reported increased depression and anxiety that presented with auditory hallucinations (Exhibit C20F at 160). As a result of her ongoing symtpmoms [sic], her medication

10

regimen was adjusted (Exhibit C20F at 162). She reported some improvement with the adjusted medication regimen in December 2020 (Exhibit C20F at 169).

In September 2021, the claimant reported a continued ability to manage her anxiety symptoms (Exhibit C14F at 3). At the time, she also reported that her medication regimen was helping her mood but that she experienced side effects of swelling in her lower extremities (Exhibit C14F at 3). On examination, the claimant was alert and oriented to person, place, and time, with clear speech, a linear thought process, appropriate thought content, intact memory, fair attention, judgment, and insight, and intact cognitive functioning (Exhibit C14F at 4-5). While the claimant noted some irritability, she reported it as mild and at baseline (Exhibit C14F at 4). During the visit, her behavior was noted as calm and cooperative (Exhibit C14F at 4). Given the claimant's reported side effects to the medication, one of her medications was discontinued. However, in November 2021, the claimant reported the discontinuation of medication caused prior symptoms of mood swings, irritability, and anxiety to reappear (Exhibit C20F at 114). As a result, it was recommended that she restart her medication given the lack of correlation to lower extremity edema (Exhibit C20F at 116). She reported an improvement in her symptoms in December 2021 (Exhibit C20F at 120). At the time, she had normal findings related to her orientation, thought process, thought content, speech, memory, attention, judgment, and insight (Exhibit C20F at 121-122).

The claimant continued to treat her conditions in 2022. Treatment records from February 2022 note the claimant reported ongoing fluctuating moods that presented with low motivation, as well as ongoing anxiety and visual and auditory hallucinations (Exhibit C20F at 126). Notably, she reported ongoing relief of her insomnia with her melatonin (Exhibit C20F at 126). At the time, she had normal findings related to her speech, orientation, thought process, thought

11

content, memory, attention, insight, and judgment (Exhibit C20F at 127). As a result, her medication was adjusted to better manage her symptoms (Exhibit C20F at 127). While she continued to report ongoing symptoms later in February 2022, she elected to continue on her medication regimen unadjusted and noted it was helping with the intensity and frequency of symptoms (Exhibit C20F at 133). In May 2022, the claimant reported doing well, noting that her anxiety was manageable and her irritability well controlled (Exhibit C20F at 138). Thereafter, treatment records from June 2022 note the claimant underwent a functional capacity evaluation, where she was able to follow instructions and maintain concentration throughout the evaluation (Exhibit C22F at 10). At the time, her speech was normal and she did not have difficulty communicating effectively (Exhibit C22F at 10). The claimant continued to report doing well in July 2022 and noted reduced depression (Exhibit C26F at 6).

*Id.* at 27–29. Following that analysis, ALJ Riley concluded:

> Although the claimant asserts that her conditions prevent her from engaging in substantial gainful activity, the overall evidence of record establishes the claimant's conditions are not as debilitating as alleged. With regard to the claimant's status post cerebrovascular assault, treatment records note the claimant was required to treat with preventative medication to avoid recurrent episodes. While the claimant reported subjective physical and mental health symptoms associated with the condition, her reports of physical residual symptoms were inconsistent during the relevant period, with the claimant reporting residual effects at some treatment visits and subsequently denying any physical effects related to the condition during other visits (Exhibit C19F at 253, 260; C22F at 3). Moreover, despite the claimant's reports of physical and mental health limitations associated with her stroke, physical and mental status examinations were generally normal during the relevant period. The undersigned finds that the record supports a finding of a remote history of

the condition and ongoing treatment to manage the condition, which was sufficient to find a severe impairment. However, the record fails to establish any significant and ongoing symptoms associated with her condition. With regard to the claimant's physical limitations, the undersigned again notes that the claimant reported that she was not experiencing physical limitations that she felt were disabling (Exhibit C19F at 253, 260). The undersigned finds that her February 2022 reporting is consistent with the overall evidence of record. While the record notes a history of asthma, treatment records again note the claimant treated the condition conservatively with the use of an inhaler. Nothing in the record establishes the claimant experienced exacerbations that required more aggressive treatment due to abnormalities. Similarly, the claimant's osteoarthritis was treated conservatively with topical medication and heat therapy, and notations of aqua therapy when needed. With regard to the claimant's obstructive sleep apnea, the record indicates the claimant's condition was diagnosed during the relevant period and treated with CPAP therapy. Nothing in the record establishes any significant and ongoing difficulty despite CPAP treatment. With regard to the claimant's migraine headache, her condition improved to a point in which the claimant tolerated her regimen and it was generally controlling her symptoms. Notably, the claimant's condition was manageable to a point in which she declined additional preventative measures. With regard to the claimant's mental health conditions, the overall record notes a history of mental health conditions for which the claimant received treatment during the relevant period. The record notes multiple medication adjustments to manage her subjective symptoms of mood fluctuations, irritability, hallucinations, racing thoughts, and panic attacks. However, the overall evidence of record fails to establish the symptoms caused any significant limitations during mental status examinations. Instead, the overall evidence of record notes the claimant generally maintained normal orientation, thought processing, thought content, memory, attention, judgment, insight, and cognitive

functioning during the relevant period. The undersigned has also considered the overall impact of the claimant's weight on her underlying conditions.

Similarly, the claimant's activities of daily living suggest that the claimant's conditions are not as debilitating as alleged. The claimant is able to care for her personal care needs, including her ability to dress, bathe, care for her hair, shave, feed herself, and use the bathroom (Exhibit C9E). She is also able to assist in providing care for her children, one of which has special needs, and family pets (Exhibit C9E). In addition, the claimant is able to preform [sic] housework, such as doing the laundry and cleaning bathrooms (Exhibit C9E). The claimant can go outside, shop in stores, and operate a motor vehicle (Exhibit C9E).

*Id.* at 26–30 (errors in original).

ALJ Riley also evaluated the medical opinions in determining the limitations imposed by Pagan's physical impairments. Of relevance to this report and recommendation, the ALJ specifically considered:

The undersigned considered the opinion of Richard Williams, Ph.D., a state agency consultant. On June 3, 2021, Dr. Williams determined the claimant had a moderate limitation in her ability to concentrate, persist, or maintain pace and a mild limitation in her ability to understand, remember, or apply information, but no limitation in the ability to adapt or manage herself (Exhibit C3A). The undersigned considered the opinion of Molly Cowan, Psy.D., a state agency consultant. On November 18, 2021, Dr. Cowan determined the claimant had moderate limitations in her ability understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself (Exhibit C7A; C10A). She further determined the claimant can perform one to two step routine tasks in a stable

environment (Exhibit C7A; C10A). To the extent that the opinions find that the claimant has severe mental health impairments, they are supported by and consistent with the overall evidence of record, which notes a history of mental health conditions that the claimant continued to treat during the relevant period. They are also supported by and consistent with the claimant's subjective reports of symptoms and the length and extent of treatment to manage her symptoms. Given the frequency of medication adjustments to manage the claimant's symptoms, the undersigned finds that the record more closely supports moderate limitations in each of the four broad areas of functioning. Therefore, the opinion of Dr. Cowan is more persuasive. Nonetheless, the opinions are generally persuasive.

The undersigned considered the opinion of Kevin Hollick, D.O., a state agency consultant. On July 14, 2021, Dr. Hollick determined the claimant must avoid concentrated noise, vibration, fumes, odors, dusts, gases, and poorly ventilated areas (Exhibit C3A; C4A). The undersigned considered the opinion of Angela Walker, M.D., a state agency consultant. On November 22, 2021, Dr. Walker determined the claimant could perform light work, except that she may occasionally balance, stoop, crouch, and climb ramps or stairs but must never kneel, crawl, or climb ladders, ropes, or scaffolds (Exhibit C7A; C10A). She further determined the claimant must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poorly ventilated areas, and hazards (Exhibit C7A; C10A). The opinions are supported by and consistent with the overall evidence of record that notes the claimant has a history of combined physical impairments that caused subjective reports of pain and tenderness. They are also supported by the record that notes, despite the claimant's subjective reports, she generally maintained her gait, strength, and range of motion despite the presence of the impairments. In addition, the opinion is supported by and consistent with the claimant's history of stroke and ongoing

weight in the obese range. Given the overall evidence, the opinions are persuasive.

. . . .

The undersigned considered the opinion of Denyse Allen, MD, an independent medical examiner. On June 7, 2022, Dr. Allen determined the claimant was in the sedentary workload category (Exhibit C22F at 3). Dr. Allen specifically noted that the claimant demonstrated the ability to lift 20 pounds and carry 10 pounds on an occasional basis (Exhibit C22F at 15). Of note, Dr. Allen reported the testing consistently represented the claimant's safe maximal performance (Exhibit C22F at 3). However, the finding is inconsistent with the evaluation findings that note the claimant had indicators suggestive of submaximal effort with strength testing using the Pinch Grip Key, UTM Cart Push, UTM Cart Pull (Exhibit C22F at 8). In addition, the findings are not consistent with the overall evidence of record, and also suggestive of inconsistent effort, based on her discontinuing several tests due to reports of pain in her left shoulder, hands, and bilateral calf muscles (Exhibit C22F at 5). Notably, these symptoms were not reported at treatment visits during the relevant period (Exhibit C22F at 5). The claimant also stopped positional testing due to lower back pain, which was also not generally reported or treated during the relevant period (Exhibit C22F). The undersigned finds that the opinion overly accounted for the claimant's subjective reports during testing and, therefore, overly restricted her exertional abilities. Therefore, the opinion is not persuasive.

*Id*. at 30–31. Finally, ALJ Riley concluded:

In sum, the above residual functional capacity assessment is supported by the symptoms and medical conditions identified by the claimant, which have been verified in the medical evidence record, and the limitations identified by medical providers.

16

*Id.* at 32.

Having determined Pagan's residual functional capacity to perform light work subject to limitations, and rejected several grounds for further limitation, ALJ Riley proceeded to the fourth step of the analysis to determine whether Pagan was disabled within the meaning of the Social Security Act. Here, with assistance from a vocational expert's testimony, ALJ Riley compared Pagan's past relevant work and residual functional capacity, finding that Pagan was unable to perform her prior employment as a forklift operator and home health aide. *Id.* at 32.

Finally, in the fifth step of the sequential analysis process, ALJ Riley considered Pagan's age, education, work experience, and residual functional capacity to perform light work, concluding that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" *Id.* Here, ALJ Riley again leveraged testimony from a vocational expert, reaching the specific conclusion that an individual fitting Pagan's parameters could perform the occupational requirements of a router, marker, or document preparer. Tr. 33.

As a result of this analysis, ALJ Riley determined that Pagan was not disabled and denied her application for disability benefits. *Id.* Pagan unsuccessfully appealed the decision to the Social Security Administration's Appeals Council, which denied Pagan's request to review ALJ Riley's decision on August 31, 2023. *Id.* at 1. Having exhausted her administrative remedies, Pagan's instant appeal to the district court followed.

Pagan initiated this action with the Court on September 11, 2023. Doc. 1. The Commissioner filed an answer denying Pagan's claim of error and provided the revised, operative transcripts from the disability proceedings on January 8, 2024. Docs. 6, 16. The parties filed their respective briefs on November 27, 2023, and January 9, 2024. Docs. 9, 19.

In her brief, Pagan alleges three errors that warrant reversal or remand. Doc. 9 at 1–2, 13, 21, 24. Specifically, Pagan alleges that ALJ Riley: (1) failed to include more significant limitations in her RFC to account for her severe impairments; (2) erred when he found several of her issues were not severe impairments at step two; and (3) erred when

he evaluated certain medical opinion evidence. *Id.* at 15–18, 21–23, 27–29.

## III.  Discussion

### A.    Standard of Review

Review of the Commissioner's decision denying a claimant's application for social security disability benefits is limited to determining whether the factual findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial in this context is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citation omitted). Put more pointedly, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In an adequately developed record, this can mean "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [an ALJ's decision] from

being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n.*, 383 U.S. 607, 620 (1966) (citations omitted).

Under this deferential standard, "[f]actual findings which are supported by substantial evidence must be upheld." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) (citations omitted); 42 U.S.C. § 405(g). This court's role is not to reweigh the evidence and make factual determinations, but to simply review the record and ensure that the ALJ provided "a discussion of the evidence and an explanation of reasoning for his conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations and quotations omitted). An ALJ meets that standard by stating "in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of SSA*, 181 F.3d 429, 433 (3d Cir. 1999) (citations omitted). Moreover, when there is countervailing evidence, an ALJ must "give some reason for discounting the evidence she rejects." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citation omitted); *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (holding that substantial evidence standard is

unmet when ALJ fails to resolve conflicts created by countervailing evidence).

Here, ALJ Riley's factual findings were supported by substantial evidence in the record, and the reasoning underlying those conclusions was sufficient to enable judicial review.

## B.    The ALJ's Residual Functional Capacity Finding

Pagan first contends that ALJ Riley did not provide sufficient limitations in her residual functional capacity to account for her severe impairments. Doc. 9 at 15–18. Specifically, she avers that, in addition to her current limitations, her severe impairments require limitations for unscheduled breaks, absences, a sit/stand option, leg elevation, and being off task. *Id.* at 20. She argues that these limitations are supported by the weight of the evidence and posits that they will be necessary to account for future deficits caused by several of her severe impairments. *Id.* at 15–18. She also argues that they are necessary to address issues from her impairments not covered by the ALJ. *Id.* A review of the record, however, reveals that ALJ Riley explicitly addressed the issues Pagan alleges he did not, that his limitations are supported by

substantial evidence, and that his residual functional capacity

determination fully complied with applicable regulations.

In determining Pagan's residual functional capacity, ALJ Riley

concluded that she was limited to performing "light work as defined in

20 C.F.R. 404.1567(b) except for the following limitations." Tr. 25. The

ALJ then proceeded to list further limitations on Pagan's ability to

perform certain activities, including, among others, her ability to

balance, stoop, crouch, climb, kneel, crawl, stay on task, and maintain

regular attendance. *Id.* In particular, the ALJ provided that Pagan

"may occasionally balance, stoop, crouch, and climb ramps or stairs, but

must never kneel, crawl, or climb ladders, ropes, or scaffolds. . . . [and

she] can sustain attention for extended periods of two hour segments

while maintaining regular attendance and being punctual within

customary allowances, in an environment free of fast paced production

activity." *Id.* ALJ Riley fashioned these limitations to accommodate

Pagan's alleged symptoms, at least to the extent that he found such

alleged symptoms supported by the evidence of record. *Id.* at 32.

As noted above, Pagan contends that these limitations are

inadequate, and advances three arguments in support. First, she argues

that the weight of the evidence supports more extensive limitations than those included by ALJ Riley. *Id.* at 15, 18–20; Doc. 19 at 26–29. Second, she posits that by virtue of having bipolar disorder, depressive disorder/persistent mood disorder, anxiety disorder, and insomnia impairments, she allegedly will suffer deficits in the areas of concentration and focus, thus making it difficult, if not impossible, to perform work on a sustained basis. *Id.* at 15–16, 18; Doc. 19 at 25–26. Third, she argues that the record evidence shows "additional issues" not covered by the ALJ, such as "mental-health related treatment related to feelings of hopelessness, daily mood swings, constant wor[ry] and anxiety, with isolating behavior, excessive crying and feeling down," "ongoing issues with insomnia," "body aches, dizziness and weight gain," and "bi-lateral leg swelling/edema." Tr. 16–18; Doc. 19 at 27.

As a general rule, "the outcome of [a disability] c[laim] depends on the demonstration of the functional limitations of the disease or impairment . . . [instead of] the mere diagnosis of the disease or name of the impairment." *McKean v. Colvin*, 150 F. Supp. 3d 406, 417 (M.D. Pa. 2015) (citing *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir.

1996)). Thus, "[a] diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act." *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004). Rather, the Social Security Act requires "objective medical evidence showing the existence of an impairment which could reasonably be expected to produce the claimed pain." *Id.* at 781.

In assessing whether the objective medical evidence shows the existence of an impairment which could reasonably be expected to produce a claimant's alleged pain, the ALJ "may properly accept some parts of the . . . evidence and reject other parts, but she must consider all the [probative] evidence and give some reason for discounting the evidence she rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). This, importantly, does not mean that the ALJ must undertake an exhaustive discussion of *all* of the evidence. *See, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record."); *Beety-Monticelli v. Comm'r of Soc. Sec.* 343 F. App'x 743, 747 (3d Cir. 2009) ("[The ALJ] need not mention every piece of evidence in the record.").

24

Consistent with these principles, a claimant's "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529). As such, when a claimant's statements about the severity of their impairment is not well-grounded in the objective medical evidence, but the underlying impairment "could reasonably be expected to produce" the complained of pain or symptoms, the "ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *McKean*, 150 F. Supp. 3d at 415–16.

This mandate to anchor both statements and credibility determinations in the evidence of record overlaps with the regulatory framework governing an ALJ's assessment of alleged symptoms. The regulations require consideration of all symptoms and the extent to which such symptoms are reasonably consistent with the objective medical and other evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). This includes the claimant's statements and descriptions from medical and non-medical sources regarding how the symptoms affect the claimant's activities of daily living and ability to work. *Id.* At bottom, however, the

regulations require objective medical evidence from an acceptable medical source showing the presence of an impairment that could reasonably be expected to produce the symptoms alleged and that, when considered with all the other evidence, would lead to a disability determination. *Id.*

When evaluating a claimant's symptoms, the ALJ must follow a two-step process to (1) ascertain whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms, and (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which they limit his ability to perform work-related activities. SSR 16-3p, 82 Fed. Reg. 49462, 49463-62 (October 25, 2017). To assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify several factors that may be relevant to the assessment of the severity or limiting effects of a claimant's impairment. 20 C.F.R. §§ 416.929(c)(3), 404.1529(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any

26

medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. *Id.*

Here, ALJ Riley properly weighed the objective medical evidence and followed the two-step process for assessing Pagan's credibility. He found at the first step of the process that Pagan's "medically determinable impairments could reasonably be expected to cause" her alleged symptoms. Tr. 25. In reaching this conclusion, ALJ Riley found that the record, including treatment records and examinations, established Pagan's post cerebrovascular assault (stroke) status, osteoarthritis of the bilateral knees, asthma, obstructive sleep apnea, migraines, anxiety disorder, depressive disorder, and insomnia. Tr. 26–29. The nature of these severe impairments, coupled with Pagan's allegations concerning her symptoms impeding her ability to work, care for her personal needs, sleep, move, understand and remember, concentrate, interact, and handle stress and medication side effects, led ALJ Riley to find that the latter could reasonably cause the former. *Id.*

at 25. At the second step of the process, however, ALJ Riley found that Pagan's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." *Id.* at 26.

In support of that determination, ALJ Riley evaluated the location, duration, frequency, and intensity of Pagan's symptoms, activities of daily living, medications, and treatments she used to alleviate her symptoms. He first evaluated Pagan's symptoms, treatments, and medications with regard to her post cerebrovascular assault status, finding that while Pagan required "preventative medication to avoid recurrent episodes" and that she had at times "reported subjective physical and mental health symptoms associated with the condition," her reporting of these symptoms was inconsistent. *Id.* at 29. He further found that "despite the claimant's reports of physical and mental health limitations associated with her stroke, physical and mental status examinations were generally normal during the relevant period." *Id.* at 29. Likewise, he found that "[w]ith regard to the claimant's physical limitations, the undersigned again notes that the claimant reported that she was not experiencing physical

28

limitations that she felt were disabling . . . ." *Id.* at 29. Ultimately, while ALJ Riley recognized that the evidence at least supported a finding of severe impairment, he found that the condition only had a limited impact on Pagan's functioning because the evidence "fails to establish any significant and ongoing symptoms associated with her condition." Tr. 29.

Second, the ALJ evaluated Pagan's symptoms, treatments, and medications regarding her asthma, osteoarthritis, and sleep apnea, and found that all three conditions had a limited impact on her functioning, and were well under control with conservative treatments like inhalers, topical medications, heat therapy, water therapy, and CPAP therapy. *Id.* at 29–30. Moreover, he found that the record showed Pagan did not require anything beyond such conservative treatments. *Id.*

Third, ALJ Riley evaluated Pagan's symptoms, treatments, and medications regarding her migraines, and found that the record showed her condition did not drastically limit her functioning because it "improved to a point in which the claimant tolerated her regimen and it was generally controlling her symptoms. Notably, the claimant's condition was manageable to a point in which she declined additional

preventative measures." *Id.* at 30. Fourth, the ALJ evaluated Pagan's symptoms, treatments, and medications regarding her anxiety disorder, depressive disorder, and insomnia, and found that despite receiving treatment for these disorders and at times having symptoms of "mood fluctuations, irritability, hallucinations, racing thoughts, and panic attacks[,]" the record failed to establish that the symptoms "caused any significant limitations during mental status examinations." *Id.* Specifically, the record showed that, upon examination, Pagan "generally maintained normal orientation, thought processing, thought content, memory, attention, judgment, insight, and cognitive functioning during the relevant period." *Id.*

Lastly, ALJ Riley separately assessed Pagan's activities of daily living, and found that they tended to show her symptoms were less debilitating than she alleged. His finding was based on the fact that the record showed Pagan was "able to care for her personal care needs, including her ability to dress, bathe, care for her hair, shave, feed herself, and use the bathroom[,]" care for children and pet's needs, perform housework, and "go outside alone, shop in stores, and operate a motor vehicle[.]" Tr. 30.

Having found Pagan's statements concerning the limiting effects of her symptoms inconsistent with the relevant evidence of record, ALJ Riley deemed her statements non-credible. *Id.* at 29. This, in part, informed the ALJ's finding that Pagan can perform light work subject to a host of other personally tailored limitations. *Id.* at 25. Overall, that thorough reasoning readily permits meaningful judicial review.

Pagan's overarching argument that the limitations in her residual functional capacity are inadequate to account for her impairments is unavailing because, as outlined above, the method ALJ Riley used to assess the limiting effects of her symptoms was sound. Preliminarily, to the extent Pagan speculates that some of her impairments *could* or *would* lead to an increase in symptoms based on the nature of the impairments, and that she therefore requires greater limitations than those found by ALJ Riley (Doc. 9 at 15–16, 18), that argument fails. As the Commissioner correctly points out (Doc. 19 at 26), a diagnosis of impairment, and whatever hypothetical problems may arise from it, does not meaningfully move the needle on a disability determination. Rather, a claimant must provide credible evidence showing "that the impairment resulted in disabling limitations." *Phillips*, 91 F. App'x at

31

780. Mere speculation, as offered by Pagan here, falls short of meeting that burden.

Alternatively, to the extent that Pagan argues that the weight of the evidence supports greater limitations, that contention also fails. Where an ALJ's factual findings are supported by substantial evidence, the Court is required to uphold them. *Ficca*, 901 F. Supp. 2d at 536; *see also Consolo*, 383 U.S. at 620 ("[S]omething less than the weight of the evidence, . . . does not prevent [it] from being supported by substantial evidence."). Thus, assuming *some* evidence supports one of ALJ Riley's findings, then all he need do to comply with the substantial evidence standard is state "which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck*, 181 F.3d at 433. That is precisely what ALJ Riley did here, when he laid out the objective evidence relevant to assessing Pagan's statements concerning the limiting effects of her symptoms, and then assessed the credibility of the statements by comparing the two. *See supra* at 27–30.

Although Pagan may disagree with the ALJ's conclusions, his assessment of her symptoms was supported by a large quantity of evidence. *See* Tr. 503, 506, 671–72, 822, 826, 847, 888, 933–44, 952, 955,

963, 1326, 1329, 1382, 1389, 1450–63, 1517–19, 1524–25, 1529–30, 1536, 1541, 1552, 1563, 1565, 1572, 1621–24, 1627–29, 1634, 1861. In addition, after surveying this evidence, the ALJ thoroughly explained his reasons for rejecting Pagan's statements regarding the limiting effects of her symptoms in favor of the relevant objective evidence in determining her limitations. *Id.* at 29–30. As such, ALJ Riley's limitation findings, insofar as they are based on this comprehensive credibility assessment, must be upheld. *Ficca*, 901 F. Supp. 2d at 536; *Schaudeck*, 181 F.3d at 433; *Diaz*, 577 F.3d at 506.

Lastly, Pagan's argument that further limitations are necessary to account for issues from her impairments not addressed by the ALJ, is without merit. Critically, as the Commissioner points out (Doc. 19 at 27), Pagan's contention that ALJ Riley did not address her issues with respect to mental health treatment, insomnia, body aches, dizziness, weight gain, and edema (Doc. 9 at 16–18), is directly refuted by the opinion itself. *See* Tr. 26–30 ("[t]he claimant notes that she takes medication to treat her conditions, which cause side effects of drowsiness"; "the claimant reported experiencing weight gain as a side effect to one of her medications"; "[t]reatment records from August 2019

33

note the claimant reported chronic insomnia"; "[t]reatment records from April 2021 note the claimant reported her medications were not helping as much, and noted experiencing increased depression, mood swings, irritability, mania, racing thoughts, and a first time history of a panic attack"; "she also reported that her medication regimen was helping her mood but that she experienced side effects of swelling in her lower extremities"). Moreover, Pagan's secondary contention that ALJ Riley failed to note certain records in his opinion (Doc. 9 at 17), is also unavailing, because an ALJ is not required to undertake an exhaustive discussion of *all* of the evidence. *Fargnoli*, 247 F.3d at 42. That rings particularly true in this circumstance where, as explained above, the ALJ expressly recognized the issues addressed in the medical records Pagan now insists required special attention.

Accordingly, as a review of ALJ Riley's opinion shows that his limitation findings were based on substantial record evidence, and the reasoning underlying those findings was sufficient to enable judicial review, they will not be disturbed. *Ficca*, 901 F. Supp. 2d at 536; *Diaz*, 577 F.3d at 506.

### C.    The Evaluation of Pagan's Stomach Pain, Memory Loss, Panic Attacks, Hallucinations, Edema, Fatigue, and Concentration

Pagan next argues that the ALJ erred in not finding that her stomach pain, memory loss, panic attacks, hallucinations, edema, fatigue, and concentration problems were severe impairments under the second step of the Social Security Act's sequential evaluation process. Doc. 9 at 21–24. In the alternative, she appears to argue that these seven maladies were not sufficiently discussed or addressed in the ALJ's limitation findings. *Id.* But, this argument yields no relief where, as here, any potential error was harmless and the ALJ evaluated the record and articulated his findings to a degree sufficient to permit meaningful judicial review.

At step two of the sequential evaluation process, ALJ Riley found that Pagan was afflicted with ten severe impairments: osteoarthritis of the bilateral knees, obesity, obstructive sleep apnea, asthma, status post cerebrovascular assault, migraine headaches, bipolar disorder, depressive disorder/persistent mood disorder, anxiety disorder, and insomnia. Tr. 21. He also considered evidence of several other alleged impairments, including umbilical hernia, an ankle sprain,

35

dysmenorrhea, hypertension, and gastroesophageal reflux disease , but found that these conditions were not severe. *Id.*

The second step of the Social Security Act's sequential disability analysis requires an ALJ to determine whether a claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered severe only if it "significantly limits an individual's physical or mental abilities to do basic work activities." 20 C.F.R. § 404.1520(c). Impairments are found non-severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . ." SSR 85-28, 1985 WL 56856, at *3 (1985).

At step two of the analysis, the burden lies on the claimant to establish that she has a severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The Court of Appeals has explained that the evidentiary burden to show a "severe" impairment is relatively low, because step two only functions as "a de minimis screening device to dispose of groundless claims." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (quoting *Newell v. Comm'r of Soc. Sec.*, 347 F.3d

541, 546 (3d Cir. 2003)). This means that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits at step two." *Newell*, 347 F.3d at 546 (citing *Bowen*, 482 U.S. at 158 (O'Conner, J., concurring)).

However small the evidentiary burden at step two may be, there still must be sufficient objective medical evidence to support a finding of severe impairment. *Kirk v. Comm'r of Soc. Sec.*, 177 F. App'x 205, 207 n.3 (3d Cir. 2006). Moreover, even in the event that an ALJ errs at step two in finding a claimant's condition is a non-severe impairment, that error is harmless where the analysis nevertheless moved beyond step two on account of a finding that the claimant had other severe impairments. *See Orr v. Comm'r Soc. Sec.*, 805 F. App'x 85, 88 (3d Cir. 2020) ("[B]ecause the ALJ progressed to a later step, any error at Step Two would not alter the remainder of the five-step process, much less the overall outcome."); *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 145 n.2 (3d Cir. 2007) (same).

Here, Pagan's argument that ALJ Riley erred in not finding that several of her documented conditions were severe impairments provides no tenable grounds for relief. Even assuming Pagan is correct, and that

ALJ Riley erred when he found that her stomach pain, memory loss, panic attacks, hallucinations, edema, fatigue, and concentration problems were non-severe impairments (Doc. 9 at 21–24), it would have been harmless. Importantly, despite not finding that those seven issues were severe impairments, the ALJ still found that ten of Pagan's impairments were severe and continued beyond step two of the sequential analysis on that basis. Tr. 21–33. This means that, irrespective of any error at step two, Pagan would have suffered no harm "because the ALJ progressed to a later step[.]" *Orr*, 805 F. App'x at 88.

Furthermore, as the Commissioner notes, the seven issues Pagan argues should have been deemed severe impairments are not even cognizable as impairments. Doc. 19 at 30–32. Indeed, as SSR 96-4p makes abundantly clear, "an individual's symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect the individual's ability to do basic work activities . . . unless medical signs and laboratory findings show that there is a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptom(s) alleged." SSR 96-4p,

38

1996 WL 374187, at *2 (1996). In other words, unless there is sufficient evidence of some associated diagnosed or diagnosable, symptoms like pain, fatigue, general mental deficits and disturbances, and other general maladies as here, cannot be deemed independently disabling.

As the Commissioner correctly avers (Doc. 19 at 31), the seven general issues advanced by Pagan in her argument, including stomach pain, memory loss, panic attacks, hallucinations, edema (*i.e.*, swelling), fatigue, and concentration problems, hew much more closely to symptoms of underlying conditions rather than medically determinable impairments. *See, e.g.*, SSR 96-4p, 1996 WL 374187, at *2 (1996) ("symptoms, such as pain, fatigue, . . . or nervousness"); *Kozick v. Kijakazi*, 2023 WL 6144850, at *8 (M.D. Pa. 2023), *report and recommendation adopted*, 2023 WL 6143956 (M.D. Pa. 2023) ("[G]enerally, auditory hallucinations are a symptom, not an impairment."); *Williams v. Colvin*, 2014 WL 4918469, at *8 (M.D. Pa. 2014) ("[A]n anxiety attack is a symptom, and not an impairment."); *Murphy v. Astrue*, 2013 WL 3964910, at *2 (D.N.J. 2013) ("[T]he ALJ also noted that [claimant]'s symptoms of leg edema and chest pain were not 'diagnostically related' to her [condition]."); *Neff v. Astrue*, 875 F.

Supp. 2d 411, 424 (D. Del. 2012) ("Subjective symptoms, such as memory loss, must be supported by objective medical evidence."); *Mederos v. Colvin*, 2015 WL 5167109, at *4 (D.N.J. 2015) ("This encompassed her subjective reported symptoms of uncontrolled diabetes and other symptoms that included . . . concentration and memory problems[.]").

Likewise, the Commissioner is also correct that ALJ Riley's opinion refutes Pagan's alternative argument that these seven issues were not sufficiently discussed or addressed in the ALJ's limitation findings. Doc. 19 at 35–36; *see* Tr. 21–28 ("The record establishes the claimant has a history of gastroesophageal reflux disease. Treatment records from June 2020 note the claimant was referred to a gastroenterologist"; "[d]uring the relevant period, she also reported . . . auditory hallucinations"; "[t]he claimant asserts that her conditions limit her ability to understand and remember things, follow both written and spoken instructions, concentrate, and handle stress and changes in routine"; "[d]uring a functional capacity evaluation in June 2022, the claimant reported symptoms of pain and fatigue that limited her participation in work activities, leisure activities, and activities of

daily living[]"; "[t]reatment records from April 2021 note the claimant reported her medications were not helping as much, and noted experiencing . . . a first time history of a panic attack[.]").

In essence, Pagan asks the Court to reweigh the evidence in her favor here, but "[c]ourts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Because any alleged error made by ALJ Riley at step two would have been harmless, and because his conclusions and accompanying findings concerning Pagan's impairments are supported by substantial evidence in the record and are sufficiently articulated to permit judicial review, they will be upheld. *Orr*, 805 F. App'x at 88; *Kirk*, 177 F. App'x at 207 n.3.

### D. The ALJ's Evaluation of the Medical Opinions of Dr. Denyse Allen, Dr. Kevin Hollick, Dr. Angela Walker, and Michael Riggi

Finally, Pagan contends that ALJ Riley erred in not assessing the opinion given by Dr. Denyse Allen in an assessment form. Doc. 9 at 27. Pagan also contends that the ALJ erred in assessing and rejecting the opinion of occupational therapist Michael Riggi, and in assigning persuasive weight to the opinions of Dr. Kevin Hollick and Dr. Angela

41

Walker. *Id.* at 27–29. But Pagan's disagreement with the ALJ's assessment of these opinions does not warrant remand where, as here, those evaluations comported with all applicable regulatory requirements.

On June 3, 2020, Dr. Allen completed an employability assessment form related to his treatment of Pagan. Tr. 750–52. Of relevance, he described Pagan as having a history of cerebral infarction, bipolar disorder, obesity, and migraines. *Id.* at 750. In consideration of these conditions, Dr. Allen opined that Pagan was disabled as of that date. *Id.* at 751.

On July 14, 2021, Dr. Hollick evaluated the medical evidence pertaining to Pagan's conditions and concluded that to accommodate them, it was necessary for Pagan to avoid concentrated exposure to noise, vibrations, fumes, odors, dusts, gases, and poor ventilation. *Id.* at 120–30. On November 22, 2021, Dr. Walker likewise reviewed the medical evidence pertaining to Pagan's conditions and concluded that they limited her to light work, except that she could occasionally balance, stoop, crouch, and climb ramps or stairs but never kneel, crawl, or climb ladders, ropes, or scaffolds. *Id.* at 163–64. Dr. Walker also

found that it was necessary for Pagan to avoid concentrated exposure to extreme cold, vibrations, fumes, odors, dusts, gases, poorly ventilated areas, and hazards like machinery and heights. *Id.* at 164.

On June 7, 2022, occupational therapist Michael Riggi tested Pagan's functional capacity in person. Tr. 1621–23. Based on his testing of Pagan's maximum exertional abilities, where it was observed that, among other things, she could sit for 30 minutes at a time, stand for 15 minutes at a time, and lift 20 lbs. at a time, he opined that she was limited to sedentary work. *Id.* at 1622.

Under the current regulations, medical opinions are not entitled to any specific weighting, and are instead evaluated based on their persuasiveness. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b). An ALJ determines the persuasiveness of a prior medical finding or medical opinion by assessing five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(a)–(c). The factors related to the substance of medical opinions–supportability and consistency–are the "most important factors" for consideration. 20 C.F.R. § 404.1520c(b)(2). Examining supportability entails a review of the opinion's basis in

43

relevant "objective medical evidence and supporting explanations presented by a medical source"; consistency is assessed based on how consistent a finding or opinion is "with the evidence from other medical sources and nonmedical sources in the claim[.]" 20 C.F.R. § 404.1520c(c)(1)–(2).

The Court of Appeals explained in *Cotter v. Harris* that when weighing the record, an ALJ "cannot reject evidence for no reason or the wrong reason" and must explain "why probative evidence has been rejected . . . so that a reviewing court can determine whether the reasons for rejection were improper." 642 F.2d 700, 706–07 (3d Cir. 1981). This does not mean, however, that the ALJ must undertake an exhaustive discussion of all of the evidence. *See, e.g., Fargnoli*, 247 F.3d at 42; *Hur*, 94 F. App'x at 133 ("There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record."). An ALJ also has no obligation to analyze or even consider evidence that includes statements on issues, like disability status or severe impairment status, that are exclusively reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1520b(c)(3)(i)–(ii), 416.920b(c)(3)(i)–(ii).

Here, ALJ Riley first found Dr. Hollick's and Dr. Walker's opinions persuasive. He explained that their own limitation findings, such as limiting Pagan to light work and only occasionally balancing, stooping, crouching, and climbing up ramps or stairs, were "supported by and consistent with the overall evidence of record . . . ." Tr. 31. Specifically, he noted that the medical evidence showed Pagan's conditions caused subjective reports of pain and tenderness, but also that "she generally maintained her gait, strength, and range of motion despite the presence of the impairments." *Id*. Moreover, ALJ Riley found that their opinions were "supported by and consistent with the claimant's history of stroke and ongoing weight in the obese range." *Id*. Given these things, he found the two opinions persuasive.

ALJ Riley later found the opinion of Michael Riggi, who he misidentified as Dr. Allen, as unpersuasive. He noted that the examiner in the report found Pagan could only perform sedentary work, and that she "demonstrated the ability to lift 20 pounds and carry 10 pounds on an occasional basis[.]" *Id*. ALJ Riley however found that, although the examiner "consistently represented" otherwise, Pagan had not been giving her best efforts during the examination, casting doubt on the

results. *Id.* He went on to say that "the findings are not consistent with the overall evidence of record, and also suggestive of inconsistent effort, based on her discontinuing several tests due to reports of pain in her left shoulder, hands, and bilateral calf muscles[.]" *Id.* The ALJ indicated that Pagan's reports of pain in the shoulder, hand, calves, and lower back during testing were suspiciously absent from any of her other records, again casting doubt on her effort level. *Id.* Based on these things, ALJ Riley found the opinion unpersuasive. Tr. 31.

Despite Pagan's argument to the contrary, ALJ Riley was well within his regulatory authority when he did not consider Dr. Allen's June 3, 2020, employability assessment form. The regulations make it clear that when, like here, evidence includes a statement on an issue like disability status, the ALJ is under no duty to consider or analyze it. *See* 20 C.F.R. §§ 404.1520b(c)(3)(i)–(ii), 416.920b(c)(3)(i)–(ii). ALJ Riley thus committed no error when he did not consider Dr. Allen's employability assessment form.

Pagan's arguments concerning the ALJ's evaluation of the opinion of Michael Riggi likewise yield no relief. First, ALJ Riley's error when he identified Riggi's opinion as coming from Dr. Allen is largely

irrelevant, because, as the Commissioner correctly notes (Doc. 19 at 42), Pagan has failed to explain how this error made any difference in the outcome. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) ("[Claimant] therefore must 'explain [ ] . . . how the . . . error to which he points could have made any difference.' ") (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

Second, Pagan's argument that the ALJ failed to enumerate several of Riggi's findings is also irrelevant. As detailed above, the ALJ evaluated Riggi's opinion as a whole under the factors of consistency and supportability (Tr. 31), and therefore his conclusion that the opinion did not merit persuasive weight satisfied his regulatory duty. *See, e.g., Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991) (holding medical opinions that are inconsistent with and unsupported by the medical evidence are not persuasive or controlling); *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990) (same).

Similarly, Pagan's argument that the ALJ erred by finding the opinions of Dr. Hollick and Dr. Walker persuasive is without basis. As explained above, ALJ Riley evaluated the opinions of Dr. Hollick and Dr. Walker under the factors of consistency and supportability (Tr. 31),

47

and so his conclusion that they merited persuasive weight met his regulatory duty. *Jones*, 954 F.2d at 129; *Wright*, 900 F.2d at 683. The fact that these opinions were delivered a year before the date of ALJ Riley's hearing, or that the opinions were not based on testing observations, is beside the point. *See Chandler*, 667 F.3d at 361 ("The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it."); 20 C.F.R. §§ 404.1520c(a), 404.1520c(b).

This Court's role is not to re-weigh the evidence to make its own factual determinations. *Chandler*, 667 F.3d at 359. Accordingly, because ALJ Riley evaluated the relevant opinion evidence pursuant to his regulatory duty to assess persuasiveness, his findings will not be disturbed.

## IV.    Conclusion

Accordingly, the Court will affirm the decision of the Commissioner and deny the Plaintiff's request for relief. A separate order shall be issued.

Date:  October 6, 2025        *s/ Phillip J. Caraballo*
                               Phillip J. Caraballo
                               United States Magistrate Judge

48